HOWARD & HOWARD ATTORNEYS PLLC
Robert Hernquist, Nevada Bar No. 10616
RHernquist@HowardandHoward.com
Kimberly P. Stein, Nevada Bar No. 8675
KStein@HowardandHoward.com
Wells Fargo Tower, Suite 1000
3800 Howard Hughes Parkway
Las Vegas, Nevada 89169-5980
Telephone: (702) 257-1483
Facsimile: (702) 567-1568

*Attorneys for Plaintiffs Marvin Lipschultz,
and Golden Palm Investments LP*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| GOLDEN PALM INVESTMENTS LIMITED PARTNERSHIP, a Nevada limited partnership; and MARVIN LIPSCHULTZ, an individual;<br><br>      Plaintiffs,<br><br>vs.<br><br>DANIEL AZOURI, an individual; JOSEPH SINGER, an individual; and JOSEPH SINGER ENTERTAINMENT GROUP LLC, a California limited liability company;<br><br>      Defendants. | Case No. 2:15-cv-00336-KJD-VCF<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiffs Golden Palm Investments LP and Marvin Lipschultz (collectively "Plaintiffs") allege as follows:

## PARTIES

1.      Plaintiff Golden Palm Investments Limited Partnership ("GP") is a Nevada limited partnership that at all relevant times was authorized to do business in Nevada.

2.      Plaintiff Marvin Lipschultz ("Lipschultz") is and at all relevant times was a resident of Clark County, Nevada, and at all relevant times Lipschultz is and was an "elderly person" as defined by NRS 41.1395(4)(d).

3. Upon information and belief, at all times relevant Defendant Daniel Azouri ("Azouri") was and is a resident of the State of California.

4. Upon information and belief, at all times relevant Defendant Joseph Singer ("Singer") was and is a resident of the State of California.

5. At all times relevant to this case, Defendant Joseph Singer Entertainment Group LLC ("JSE") was and is an active California limited liability company.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 because this action arises under the laws of the United States, Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78aa), 18 U.S.C. §1961 *et. seq.*, and under the doctrine of pendent and/or supplemental jurisdiction.

7. This action arises under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

8. Venue is proper in this court pursuant to 29 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims asserted by Plaintiffs occurred in this judicial district.

9. This Court has personal jurisdiction over Defendants because each of them transacted business in Nevada, travelled to Nevada and held meetings with Lipschultz in Nevada during the course of the underlying events that led to Plaintiffs' investment with Defendants.

10. In connection with the acts alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the Internet.

/ / /

/ / /

/ / /

/ / /

## GENERAL ALLEGATIONS

**AZOURI INTRODUCES LIPSCHULTZ TO SINGER AND ENCOURAGES HIM TO MAKE AN INVESTMENT WITH SINGER, AND FAILS TO DISCLOSE THAT HE HAS A FINANCIAL INTEREST IN LIPSCHULTZ'S INVESTMENT**

11. Lipschultz first met Azouri at the Cannes Film Festival in approximately 2007. From 2007 through 2011, Lipschultz developed a friendship with Azouri and Azouri's mother ("Perla") based on their mutual interests in business and films.

12. Azouri and Perla visited Lipschultz in Las Vegas, Nevada in 2009 and 2010 and they again discussed mutual interests such as business and films.

13. During one of their visits to Las Vegas in 2010, Azouri and Perla told Lipschultz about their friend, Singer, who is a movie producer. Azouri and Perla told Lipschultz that Singer had always been thorough, complete and informative. Throughout 2010, Azouri and Perla spoke about Singer more and more each time they visited Lipschultz in Las Vegas and/or Cannes, and also suggested that Lipschultz should also invest with Singer.

14. On January 4, 2011, Azouri sent Lipschultz an email stating, *inter alia*:

> I wanted to have a conference call with you along with a partner of mine, Joe Singer (who produced many movies such as Dr. Doolittle, Dante Peak [sic], Courage Under Fire . . . ).
>
> We have an interesting project that we are working on involving some development and I wanted to share with you the project.
> This project is in its final stages and does not requires [sic] much of capital anymore.

15. On January 8, 2011, Lipschultz, Azouri and Singer participated in a conference call during which Singer discussed the movie industry and Singer's status as a self-proclaimed "A producer" with "A actors." Lipschultz then had several conversations thereafter with Singer and Azouri, both in person in Las Vegas as well as on the telephone. Singer told stories about his part in the movie industry and the movies he had produced and his experiences working with actor Eddie Murphy. Singer also discussed his newest "deal", whereby Singer would raise funds for future movie projects by catering to wealthy investors from the United Kingdom; the investments would be structured in such a way as to provide income tax deductions to those

Page 3 of 18

who invested.

16.   On January 9, 2011, Azouri sent an email to Lipschultz wherein Lipschultz asked to set up a meeting in Las Vegas or Los Angeles so that Azouri, Singer and Lipschultz could "discuss the project."

17.   On January 21, 2011, Lipschultz met with Azouri and Singer at the Bellagio in Las Vegas, Nevada. During the meeting, Singer and Azouri provided Lipschultz with more details regarding the "project": Singer would use Lipschultz's investment to retain lawyers, in both the United States and the United Kingdom, to create the corporation and investigate income tax and regulatory matters. Singer told Lipschultz that the purpose of the venture was to establish an investment entity and present high net-worth United Kingdom investors with an opportunity to take advantage of favorable UK tax laws by investing money in that entity, which in turn would purchase an interest in a slate of films and co-finance those films as investments with one or two specifically identified major motion picture studios in the United States.

18.   During their meetings on January 8, 2011 and January 21, 2011, and during numerous conversations thereafter, Singer repeatedly assured Lipschultz that he was "positive" that he would obtain financing from high net-worth United Kingdom investors once the additional legal work regarding income tax and regulatory matters was finalized because the investment would be highly advantageous to those investors for tax purposes. Those representations proved to be false.

19.   During their meetings on January 8, 2011 and January 21, 2011, and during numerous conversations thereafter, Singer repeatedly assured Lipschultz that he had already obtained preliminary legal opinions in both the United States and the United Kingdom and had been assured by those attorneys that the project was viable and that the enterprise would qualify for favorable tax treatment for its future high net-worth United Kingdom investors. Those representations proved to be false.

20.   Throughout January and February of 2011, Lipschultz continued to communicate

with Singer and Azouri via email and telephone regarding the project.

21. Throughout this period, all substantive communications regarding the project were between Lipschultz and Singer only, and not Azouri.

22. Throughout this period, Azouri's involvement was limited to representations to Lipschultz regarding the qualifications and expertise of Singer—Azouri was not involved in any discussion of the substantive aspects of the project and based on his minimal participation did not appear to be a partner or significantly involved in the project.

23. Throughout this period, Azouri repeatedly represented to Lipschultz and led Lipschultz to believe that he was presenting this "investment opportunity" to Lipschultz based upon his status as a mutual friend of both Singer and Lipschultz, and at no time did Azouri represent or disclose that Azouri was to receive a finder's fee or other pecuniary gain as a result of any investment made by Plaintiffs, and based upon those representations and the pre-existing relationship between Azouri and Lipschultz, Lipschultz believed and relied upon Azouri's assurances and representations that Azouri was acting as a mutual friend rather than as an interested party.

### THE INVESTMENT AGREEMENT

24. On February 26, 2011, Lipschultz on behalf of GP and Singer on behalf of JSE executed an Investment Agreement (the "Investment Agreement"), whereby Plaintiffs agreed to invest $170,000.

25. The Investment Agreement was drafted by Defendants or their agents.

26. The Investment Agreement contains a "Disclaimer" stating that GP "understands that neither the Investment nor the Investor's right to the Return have been registered under the Securities Act of 1933 as amended (the 'Securities Act'), by reason of reliance upon [JSE] on an exemption from the registration requirements of the Securities Act, nor registered under state law pursuant to similar exemptions . . . The Investor is an 'accredited investor' as such term is defined under Rule 501 of the regulations under the Securities Act."

27. Pursuant to the Investment Agreement, it shall be "construed in accordance with,

under and pursuant to Nevada law."

28. The representations within the Disclaimer of the Investment Agreement are false, in that the Investment Agreement was not exempt from registration under either federal law or Nevada law.

29. Although the Investment Agreement (which was prepared by Defendants) states that Plaintiffs qualify as an "accredited investor[s]", in violation of Rule 506 of Regulation D Defendants failed to make any inquiry and did not take any reasonable steps to verify whether Plaintiffs, or any of them, qualify as an "accredited investor".

30. Upon information and belief, at the time Plaintiffs executed the Investment Agreement a separate, undisclosed agreement existed between Singer and Azouri whereby Singer was to provide Azouri with a finder's fee based upon his procurement of Plaintiffs' investment. This finders' fee was never disclosed to Plaintiffs prior to their execution of the Investment Agreement or their funding thereof.

**AZOURI AND PERLA TELL LIPSCHULTZ THAT THE INVESTMENT IS GOING WELL, AND CONVINCE HIM TO PROVIDE SINGER WITH ADDITIONAL FUNDS**

31. In May of 2011, Lipschultz again met with Azouri and Perla at the Cannes Film Festival. Azouri and Perla both made statements about how hard Singer was working, and about how profitable the project would be.

32. In July and August of 2011, Azouri and Singer both spoke with Lipschultz on numerous occasions and informed him that the deal was progressing and looked promising.

33. In July and August of 2011, Azouri and Singer both spoke with Lipschultz on numerous occasions and informed Lipschultz that an additional $50,000 was needed for more legal fees.

34. On August 4, 2011, Lipschultz on behalf of GP and Singer on behalf of JSE executed an Additional Modified Investment Agreement (the "Additional Modified Investment Agreement"), whereby Plaintiffs agreed to invest an additional $50,000.

35. Pursuant to the Additional Modified Investment Agreement, in addition to the

Return discussed in the Investment Agreement, GP was to also be paid an additional return of $300,000 for a total return between the Investment Agreement and Additional Modified Investment Agreement of $1,150,000.

36. Upon information and belief, at the time Plaintiffs executed the Additional Modified Investment Agreement a separate, undisclosed agreement existed between Singer and Azouri whereby Singer was to provide Azouri with a finder's fee based upon his procurement of Plaintiffs' investment. This finders' fee was never disclosed to Plaintiffs prior to their execution of the Additional Modified Investment Agreement or their funding thereof.

**SINGER FAILS TO REPAY PLAINTIFFS, AND AZOURI DISCLOSES FOR THE FIRST TIME THAT HE WAS ENTITLED TO A FINDER'S FEE BASED UPON LIPSCHULTZ'S INVESTMENT**

37. Throughout 2011, 2012 and 2013, Lipschultz consistently contacted Singer regarding the status of the Universal and Sony deals. In response, Singer consistently informed Lipschultz that the Universal and Sony deals were progressing and that he was optimistic.

38. Lipschultz has never been repaid his Investment or any portion of the stated return referenced in the Investment Agreement and Additional Modified Investment Agreement.

39. Despite Singer's prior assurances that he was "positive" that he would obtain additional investors once the legal work funded by Plaintiffs' investment was finalized, Singer and JSE were unable to obtain additional financing from either investors or motion picture studios and thus Plaintiffs were never repaid as agreed.

40. Despite Singer's prior assurances that he had obtained preliminary legal opinions that the project was viable and that the enterprise would qualify for favorable tax treatment for its future investors, it was disclosed to Lipschultz after Plaintiffs' investment was spent on legal fees that the project would not qualify for such favorable tax treatment.

41. In the Fall of 2013, over two years after Plaintiffs funded the investment, Lipschultz had a telephone call with Azouri during which Azouri stated that he hoped that Singer came through with the Universal and Sony deals. Upon further inquiry from Lipschultz, Azouri disclosed for the first time that he would be receiving a commission too, based on a

finder's fee for originating Plaintiffs' investment, in the same amount that was to be paid to Plaintiffs as a Return -- $1,150,000.

42. At the time Defendants solicited Lipschultz's investment, each of them failed to disclose that Azouri would receive a finder's fee from Lipschultz's investment.

43. At the time Defendants solicited Lipschultz's investment, each of them failed to disclose that Azouri is not a licensed securities broker.

44. At the time Defendants solicited Lipschultz's investment, each of them failed to disclose that Singer is not a licensed securities broker.

45. At the time Defendants solicited Lipschultz's investment, each of them failed to disclose that both the Investment Agreement and the Additional Modified Investment Agreement was neither registered as a security nor had any notice of exemption been filed.

### FIRST CLAIM FOR RELIEF

**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder)**

46. Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 45 of the First Amended Complaint as if fully set forth herein.

47. The SEC requires disclosure of finders' fees to potential investors and failure to do so is illegal and constitutes a violation of federal securities laws.

48. The SEC considers payment of finder's fees to be a material factor when purchasing securities, and consequently payments of such finder's fees must be disclosed on Form D for exempt securities.

49. Defendants represented through the Investment Agreements that Plaintiffs' investment was exempt from registration yet Defendants never actually filed the required Form D and thus never disclosed Azouri's secret finder's fee, either expressly or through the filing of a Form D.

50. In addition to mandatory disclosure, finder's fees may only be paid to brokers or dealers who are registered with FINRA—a company or individual who receives a finder's fee

and is an unregistered broker-dealer is in violation of applicable registration requirements under federal and state law.

51. Section 15(a)(1) of the Exchange Act makes it unlawful for any broker or dealer to use the mails, or any means of interstate commerce, to effect any transactions in any security unless registered with the SEC in accordance with Section 15(b) of the Exchange Act.

52. Neither Singer nor Azouri is, or ever has been, a broker or dealer registered with FINRA.

53. As offerors of securities and as a result of their extensive prior experience in similar transactions, Defendants knew that Azouri's undisclosed finder's fee was a violation of law and also knew that the sale of unregistered securities, as unlicensed brokers, was a violation of law.

54. The Investment Agreement and Additional Modified Investment Agreement were offered to Lipschultz as securities.

55. In soliciting Lipschultz's investment, Singer and JSE made use of the telephone lines and the Internet to explain the "deal".

56. Defendant Azouri was an undisclosed agent of Singer and JSE, and also made use of the telephone lines and the Internet to explain the "deal" to Plaintiffs--although Azouri did so under the guise that he was simply acting as a mutual friend of Singer and Lipschultz.

57. Defendants and each of them knew, or were reckless in failing to know that their statements made via the telephone and/or email, and the documents provided to Lipschultz contained numerous material misstatements and omissions regarding, among other things, the true nature of Plaintiffs' investment including the risks of the business and the undisclosed facts that (a) Defendants lacked any factual basis to support the assurances made to Plaintiffs that he was "positive" that the project would obtain additional investors; (b) Defendants lacked any factual basis to support the assurances made to Plaintiffs that the project's future investors would qualify for favorable tax treatment; and (c) that Azouri would receive a finder's fee based upon Plaintiffs' investment. Specifically, the failure to disclose facts regarding the risks and

likelihood of obtaining future investors and the secret agreement to pay Azouri a finder's fee based upon Plaintiffs' investment constituted material misrepresentations and/or omissions as described in Paragraphs 11 through 56 and, *inter alia*, by:

    a.    rendering the statements and representations made by Defendants to Plaintiffs regarding the risk of the investment and status of the project false, as Defendants lacked any reasonable factual basis to make assurances that they were "positive" that additional funding would be obtained from high net-worth United Kingdom investors following the completion of the legal work that was paid for with Plaintiffs' investment. Without obtaining such high net-worth investors, the project was unlikely to obtain participation from a movie studio and thus unlikely to succeed.

    b.    rendering the statements and representations made by Defendants to Plaintiffs regarding the risk of the investment and status of the project false, as Defendants lacked any reasonable factual basis to make assurances that the project would qualify for favorable tax treatment for its future high net-worth United Kingdom investors. Without such favorable tax treatment, the project was unlikely to obtain such investors and thus was unlikely to succeed.

    c.    rendering the statements and representations made by Defendants to Plaintiffs regarding the risk of the investment and status of the project false, in that Defendants represented to Plaintiffs that the project was in its "final stages" and that any risk of the investment was negligible—those statements are rendered false by the undisclosed finder's fee, in that if the project truly was in its final stages and if the risk truly was negligible then Defendants would have been able to locate investors without engaging in the illegal behavior of paying undisclosed finder's fees to insiders. Defendants' conduct indicates they were desperate to obtain investors, and those facts were not disclosed to Plaintiffs.

    d.    rendering the statements and representations made by Defendants to Plaintiffs regarding the risk of the investment and status of the project false, in that

Defendants failed to disclose that they were so desperate for capital that they were violating SEC regulations and engaging in the illegal act of promising undisclosed finder's fees to insiders that obtained investors.

e.   rendering the statements and representations made by Defendants to Plaintiffs regarding the viability and status of the project false, in that Defendants failed to disclose that Azouri was not acting as Lipschultz's friend and that Azouri's efforts to involve Lipschultz were not based upon the trust, friendship and pre-existing relationship between Lipschultz and Azouri, as believed by Lipschultz and as represented by Azouri, but instead that Azouri was acting in his own self-interest to obtain the benefits of an undisclosed finder's fee.

f.   rendering the statements and representations made by Defendants to Plaintiffs regarding the viability and status of the project false, in that Defendants failed to disclose the extent of related-party transactions including but not limited to the promise to pay Azouri a finder's fee based upon Plaintiffs' investment.

g.   rendering the statements and representations made by Defendants to Plaintiffs regarding the viability and status of the project false, in that Defendants failed to disclose that they were acting illegally because they were engaged in the marketing and sale of securities yet neither Singer nor Azouri was a registered securities broker.

h.   rendering the statements and representations made by Defendants to Plaintiffs regarding the viability and status of the project false, in that Defendants falsely claimed that the Investment Agreement and the Additional Modified Investment Agreement were exempt from registration yet no exemption was actually filed for either security offering.

58.   Defendants through their conduct as described herein obtained $220,000 from Plaintiffs.

59.   In the manner described above, Defendants and each of them in connection with the sale of these securities and through the use of the means or instrumentality of interstate

commerce or of the mails, directly or indirectly (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as fraud or deceit upon purchasers of securities, in violation of §10 (b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. §240.10b-5), promulgated thereunder.

60.     During this period Defendants and each of them carried out a plan, scheme, and course of conduct which was intended to and did deceive Plaintiffs as alleged herein and caused Plaintiffs to execute and fund the investments as stated in the Investment Agreement and Additional Modified Investment Agreement. In furtherance of this unlawful plan, scheme, and course of conduct, Defendants and each of them took the actions set forth herein.

61.     The statements made by the Defendants during this time period were materially false and misleading because at the time they were made, the Defendants and each of them knew or recklessly ignored, and thus failed to disclose, the true nature of this investment scheme including the significant risk in obtaining future investors, the uncertainty as to whether the project would qualify for favorable tax treatment for its future investors (which in turn would significantly impede the ability to obtain investors), and Azouri's secret role as an agent of Singer and JSE who would receive a finder's fee based upon Plaintiffs' investment.

62.     Defendants' misrepresentations and omissions were material in that there was a substantial likelihood that a reasonable investor would have considered them important in deciding whether to execute and fund the investments as stated in the Investment Agreement and Additional Modified Investment Agreement.

63.     Had the Plaintiffs known of the true facts, including the true extent of the risks involved and Azouri's secret role as an agent of Singer and JSE who would receive a finder's fee based upon Plaintiffs' investment, which were not disclosed by the Defendants, Plaintiffs would not have executed the Investment Agreement and Additional Modified Investment Agreement

and would not have funded the investments because Plaintiffs, and any other reasonable investor, would have considered the misrepresentations and omissions as material and important in making a decision to invest including, *inter alia*:

  a. Plaintiffs relied upon Lipschultz's pre-existing and longstanding friendship with Azouri and Azouri's mother and believed Azouri when Azouri represented that he was presenting the investment to Lipschultz as an opportunity based upon their long-standing friendship. Those representations by Azouri are belied by the undisclosed finder's fee, and had the finder's fee been disclosed to Plaintiffs then Plaintiffs would have been alerted to the true risk involved in the project and also would have been alerted to the fact that Plaintiffs' trust and reliance in Azouri was misplaced. Plaintiffs believed Azouri was acting as a friend, and would not have made the investment had they known that Azouri was acting in his own self-interest rather than as Lipschultz's friend and that Azouri had a secret agreement to receive a finder's fee in the amount of $1,150,000 for procuring Plaintiffs' investment of $220,000—disclosure of the finder's fee would have negated Lipschultz's trust and reliance in Azouri.

  b. Had the secret finder's fee been disclosed, Plaintiffs would have been alerted that the investment was far riskier than represented by Defendants and that the status of the project was far different than that which was represented by Defendants, and thus Plaintiffs would not have made the investment. Although Defendants had represented that the project was in its "final stages" and downplayed any risk to Plaintiffs, disclosure of a secret finder's fee to Azouri in the amount of $1,150,000 for procuring Plaintiffs' investment of $220,000 would have alerted Plaintiffs of the significant and undisclosed risk involved and Plaintiffs would not have made the investment—the amount of the finder's fee, the proportion of the undisclosed finder's fee in relation to the amount of Plaintiffs' investment, and the undisclosed nature of the finder's fee all suggest that the risk borne by Plaintiffs was far greater than that disclosed by Defendants or else Defendants would likely have been able to locate investors

without engaging in the illegal behavior of paying significant and undisclosed finder's fees to insiders.

   c. Had Defendants disclosed that they were engaged in illegal conduct, including *inter alia* the agreement to pay undisclosed finder's fees and the sale of unregistered securities by unlicensed brokers, Plaintiffs would have been made aware of the questionable business practices of Defendants and significant risks involved and would not have made the investments.

   d. Plaintiffs relied upon Singer's assurances that that he was "positive" that he would obtain financing from high net-worth United Kingdom investors once the additional legal work regarding income tax and regulatory matters was finalized. Had Defendants disclosed the true risk of the investments, rather than falsely assuring Lipschultz that it was a virtual certainty that additional investors would be obtained once the legal and regulatory work was completed (and paid for with Plaintiffs' funds), Plaintiffs would have been made aware of the true risks and would not have made the investments.

   e. Plaintiffs relied upon Singer's assurances that that he had obtained preliminary legal opinions that the project was viable and that the enterprise would qualify for favorable tax treatment for its future investors. Had Defendants disclosed that there was uncertainty in this area, or disclosed that there was no factual bases for these assurances, or disclosed the project would not qualify for such favorable tax treatment, Plaintiffs would have been made aware of the true risks associated with the investment including the significant risk that the project would not be able to obtain future investors and thus would not have made the investments.

As a result of Defendants' misrepresentations and omissions, Plaintiffs have lost their entire $220,000 investment. Hence, Plaintiffs were damaged by the Defendants in violation of Section 10(b) and Rule 10b-5.

  64. Plaintiffs have been required to retain counsel in this matter, and therefore are

entitled to attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

**(Fraudulent Misrepresentations & Omission / Violation of Nevada Uniform Securities Act, NRS §§ 90.570 & 90.660)**

65. Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 64 of the First Amended Complaint as if fully set forth herein.

66. Commencing in January of 2011, Defendants made material misstatements including, among other things, statements that Singer was "positive" that he would obtain financing once the additional legal work regarding income tax and regulatory matters was finalized and statements that the enterprise would qualify for favorable tax treatment for its future investors. Those statements were false when made, and Defendants either knew those statements were false or lacked sufficient factual bases for such statements when they were made, as described in Paragraphs 1 through 64, and those misrepresentations constitute a fraud upon Plaintiffs and a violation of NRS 90.570.

67. Commencing in January of 2011, Defendants made material omissions of fact in an effort to conceal from Plaintiffs that Azouri had a financial inventive in Plaintiffs' investment and that Azouri was acting as an agent of Singer and JSE in selling securities and providing information directly and indirectly to Lipschultz, as described in Paragraphs 1 through 64, and those failures to disclose and efforts to conceal constitute a fraud upon Plaintiffs and a violation of NRS 90.570.

68. Defendants knew that their misrepresentations and omissions were material.

69. Plaintiffs justifiably relied upon such misrepresentations and omissions made by Defendants by entering into the Investment Agreement and Additional Modified Investment Agreement and by transferring the funds to JSE, and Plaintiffs would not have entered into the Investment Agreement and Additional Modified Investment Agreement or remitted any funds pursuant to those documents if Plaintiffs had known the true facts.

70. As a direct and proximate cause of Defendants' wrongful actions, Plaintiffs have

suffered damages in an amount to be proven at trial, but in excess of $75,000.

71. Plaintiffs hereby tender the securities they purchased from Defendants and demand rescission of the Investment Agreement and Additional Modified Investment Agreement, and all other remedies available in law or equity.

72. The actions of Defendants were intentional, willful and malicious, and Plaintiffs are entitled to punitive and exemplary damages pursuant to NRS 42.005.

73. It has been necessary for Plaintiffs to retain the services of attorneys to pursue this claim and they are entitled to recover their reasonable costs and attorneys' fees as damages pursuant to NRS 90.660.

### THIRD CLAIM FOR RELIEF

(Violation of Nevada Uniform Securities Act, NRS §§ 90.310, 90.460 & 90.660)

74. Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 73 of the First Amended Complaint as if fully set forth herein.

75. Defendants sold the Investment Agreement and Additional Modified Investment Agreement as securities in the State of Nevada.

76. At all times relevant, the Investment Agreement and Additional Modified Investment Agreement were neither registered pursuant to the Nevada Securities Act nor exempt from registration.

77. The Investment Agreement and Additional Modified Investment Agreement both state that they are not registered under state law pursuant to applicable exemptions, but those statements are false because there is no applicable exemption under Nevada law

78. At all times relevant, none of the Defendants was licensed to sell securities in the State of Nevada as required by the Nevada Securities Act and none of them was exempt from such licensure.

79. Defendants sold non-registered securities in the State of Nevada in violation of NRS 90.460, and at all times relevant Defendants were not licensed to sell securities in the State of Nevada in violation of NRS 90.310.

80. As a direct and proximate cause of Defendants' wrongful actions, Plaintiffs have suffered damages in an amount to be proven at trial, but in excess of $75,000.

81. Plaintiffs hereby tender the securities they purchased from Defendants and demand rescission of the Investment Agreement and Additional Modified Investment Agreement, and all other remedies available in law or equity.

82. It has been necessary for Plaintiffs to retain the services of attorneys to pursue this claim and they are entitled to recover their reasonable costs and attorneys' fees as damages pursuant to NRS 90.660.

## FOURTH CLAIM FOR RELIEF
### (Rescission)

83. Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 82 of the First Amended Complaint as if fully set forth herein..

84. Defendants by their misrepresentations, untrue statements and material omissions wrongfully and intentionally deceived Plaintiffs to induce them into entering into the Investment Agreement and Additional Modified Investment Agreement.

85. Plaintiffs are entitled to rescission of the Investment Agreement and Additional Modified Investment Agreement.

86. It has been necessary for Plaintiffs to retain the services of attorneys to pursue this claim and they are entitled to recover their reasonable costs and attorneys' fees as damages pursuant to NRS 90.660.

## FIFTH CLAIM FOR RELIEF
### (Violation of NRS 41.1395)

87. Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 86 of the First Amended Complaint as if fully set forth herein.

88. Pursuant to Nevada law, if person who is 60 years of age or older suffers a loss of money or property caused by exploitation, the person who caused the loss is liable for two times the actual damages incurred.

89. Lipschultz is an "elderly person" as defined by NRS 41.1395(4)(d).

90. Defendants exploited Lipschultz through a scheme of exploitation as described in Paragraphs 1 through 86.

91. As a direct and proximate result of Defendants' misconduct and exploitation, Lipschultz has suffered damages in excess of $75,000.

92. Defendants acted with recklessness, oppression, fraud or malice, and Lipschultz is entitled to recover attorney's fees and costs pursuant to NRS 41.1395(2).

WHEREFORE, Plaintiffs pray for relief as follows:

A. For monetary damages in excess of $75,000 on all claims;

B. For costs and attorneys' fees incurred in pursuing this action;

C. For a finding that the actions of Defendants were intentional, willful and malicious, and Plaintiffs are entitled to punitive and exemplary damages; and

D. For such other and further relief as the Court deems proper.

HOWARD & HOWARD ATTORNEYS PLLC

By: /s/ Robert Hernquist
Robert Hernquist, Nevada Bar No. 10616
Kimberly P. Stein, Nevada Bar No. 8675

*Attorneys for Plaintiffs Marvin Lipschultz and Golden Palm Investments LP*